J-A12008-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.S.C.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.C.-O., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3135 EDA 2022 |

Appeal from the Decree Entered November 22, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000074-2021

BEFORE: OLSON, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                        **FILED JUNE 15, 2023**

Appellant, H.C.-O., ("Father") appeals from the November 22, 2022 decree entered in the Court of Common Pleas of Philadelphia County that terminated his parental rights to his dependent child, L.S.C.-P., a female child born June 2019, ("the child") pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938. We affirm.

The record demonstrates that, on February 12, 2021, the Philadelphia Department of Human Services - Children and Youth Division ("DHS") filed a petition for involuntary termination of Father's parental rights pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). DHS filed an amended petition pursuant to the same provisions on March 23, 2022.[1] Jason Ross

---

[1] Both the original and amended petitions requested termination of the parental rights of R.D.P., the biological mother of the child, ("Mother")

Kleinman, Esquire ("Attorney Kleinman") was appointed as guardian *ad litem* to represent the legal and best interests of the child. Jay Steven Stillman, Esquire ("Attorney Stillman") was appointed to represent Father, and Michael John Graves, Jr., Esquire ("Attorney Graves") was appointed to represent Mother. DHS was represented by Erin Maloney, Esquire ("Attorney Maloney"), an attorney with the Philadelphia Solicitor's Office. On August 9, 2022, and November 22, 2022, the trial court conducted a hearing on the termination petition and the petition for goal change, in which the aforementioned counsel participated.[2] N.T., 11/22/22, at 5. Father attended both hearings.[3]

_____

pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). On November 22, 2022, in a separate decree, the trial court terminated Mother's parental rights to the child. Mother did not participate in the instant appeal.

[2] An evidentiary hearing on the petition for involuntary termination of parental rights was continued several times after the trial court determined that continuances were "best suited to the protection and physical, mental[,] and moral welfare of the child." Trial Court Order, 5/11/21; *see also* Trial Court Order, 8/11/21; Trial Court Order, 12/8/21; Trial Court Order 2/23/22.

A final continuance was granted on February 23, 2022, to afford DHS an opportunity to file an amended petition for involuntary termination of parental rights. The amended petition included averments that Mother's and Father's last known addresses were the same residence, as well as a revised Exhibit A (statement of facts). *Compare* Amended Petition for Involuntary Termination of Parental Rights, 3/23/22, at ¶¶3-4, Exhibit A, *with* Petition for Involuntary Termination of Parental Rights, 2/12/21, at ¶¶3-4, Exhibit A.

[3] The record reveals that Mother joined the August 9, 2022 hearing after it began, N.T., 8/9/22, at 30, and left the proceeding before it concluded, *Id.* at 89. Mother did not attend the November 22, 2022 hearing. N.T., 11/22/22, at 3-5.

On November 22, 2022, the trial court found that DHS met its burden of proof under Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act, and subsequently terminated Father's parental rights to the child. The trial court also granted DHS's request to change the permanent placement goal to one of adoption with regard to the child. This appeal followed.[4]

Father raises the following issues for our review:

1. Whether the trial court erred in terminating [Father's] parental rights under 23 Pa.C.S.A. [§ ]2511(a)(1), the evidence having been insufficient to establish [Father] evidenced a settled purpose of [relinquishing his] parental claim, or having refused or failed to perform parental duties[?]

2. Whether the [] evidence was sufficient to establish that [Father] refused or failed to perform parental duties, caused [the child] to be without essential parental care, that conditions having led to placement [] continued to exist, or finally that any of above could not have been remedied []under [] 23 Pa.C.S.A. [§§ ]2511(a)(2), 2511(a)(5), and 2511(a)(8)[?]

3. Whether the evidence was sufficient to establish that termination of parental rights would best serve the needs and welfare of the [child] under 23 Pa.C.S.[A. § ]2511(b)[?]

4. Moreover, under [S]ections 2511(a)(1), 2511(a)(2), 2511(a)(5), 2511(a)(8), and 2511(b), whether the termination of [Father's] parental rights pursuant to the

_____

[4] Father filed a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), along with his notice of appeal on December 14, 2022. The trial court filed its Rule 1925(a) opinion on January 11, 2023.

> aforemention[ed] is contrary to the [] weight of the evidence[?]

Father's Brief at 5 (extraneous capitalization and footnote omitted).

Father's issues, *in toto*, challenge the trial court's termination of his parental rights pursuant to Section 2511 of the Adoption Act. In matters involving termination of parental rights, our standard of review is well-settled.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill[-]will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

- 4 -

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b)[ - ]determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***B.J.Z.***, 207 A.3d at 921 (citation omitted). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re Z.P.***, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." ***In re I.J.***, 972 A.2d 5, 9 (Pa. Super. 2009).

Here, the trial court terminated Father's parental rights to the child pursuant to Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8). Section 2511(a) provides, in pertinent part, as follows:

### § 2511. Grounds for involuntary termination

**(a)** **General rule.** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and

termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8).

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) states,

### § 2511. Grounds for involuntary termination

. . .

**(b) Other considerations.** - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). The analysis under Section 2511(b)

focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the [trial] court when determining what is in the best interest of the child.

> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of J.N.M.*, 177 A.3d 937, 943-944 (Pa. Super. 2018) (citation and original brackets omitted), *appeal denied*, 183 A.3d 979 (Pa. 2018). A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. *J.N.M.*, 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); *see also In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)).

It is well-established that this Court need only agree with the trial court as to any one section of Section 2511(a), as well as Section 2511(b), in order to affirm an order or decree involuntarily terminating parental rights. *C.D.R.*, 111 A.3d at 1215, *relying on In re B.L.W.*, 843 A.2d 380 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Our review of the certified record confirms that DHS introduced clear and convincing evidence in support of termination pursuant to Section 2511(a)(8) and Section 2511(b).

> To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the

child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the [trial] court. Once the 12-month period has been established, the [trial] court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [DHS] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the [trial] court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [DHS] services.

*In re C.B.*, 230 A.3d 341, 348 (Pa. Super. 2020) (case citations, quotation marks and original brackets omitted), *appeal denied*, 234 A.3d 410 (Pa. 2020). "Under Section 2511(a)(8), in determining whether the conditions that led to removal and placement continue to exist, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied and[,] thus[,] whether reunification of parent and child is imminent at the time of the hearing." *C.B.*, 230 A.3d at 348-349 (citation, original quotation marks, and original brackets omitted).

With respect to the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b), we have observed:

Initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical[,] and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a

[trial] court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of the child, as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 349 (citation, original brackets, and some quotation marks omitted).

In the case *sub judice*, the trial court explained its reasons for terminating Father's parental rights to the child pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) as follows:[5]

By way of background, [the child] has been in care for 40 months. The termination petition in this case was filed in February [] 202[1], and an amended [termination petition was filed] in March [] 2022. . . .

With regards to [Section] 2511(a)(1), [i]n the six months preceding the filing of [the termination] petition, the [trial] court [found] that both [Mother and Father] failed to perform parental duties. Prior to commencing Family School[6] in February [] 2022, [Mother and Father] did not have in-person visits with the child, did not make inquiries into the child's well-being, did not meet any

---

[5] Although our decision to affirm the termination of Father's parental rights rests upon Section 2511(a)(8) and Section 2511(b), we shall incorporate the entirety of the trial court's findings pertaining to all of the provisions in Section 2511(a) because of the substantial overlap between these statutory provisions and the elements of Section 2511(a)(8).

[6] "Family School" is a learning environment in which a parent is observed interacting with his or her child while a coach is present to give instruction to the parent on how to care for the child. N.T., 8/9/22, at 52-53.

of the child's daily needs, did not make any attempts to do so, and[,] in fact, failed to perform parental duties, and that was established by clear and convincing evidence by the witnesses presented by [DHS.]

With regard to [Section] 2511(a)(2), [w]ith regard to [Mother,] this case [arose] because of [Mother's] drug and alcohol issues. [Mother] has made no attempts throughout [] this case to avail herself of the necessary measures to alleviate the drug and alcohol concerns.

With regard to [Father], the [trial] court understands [Father's] arguments regarding the evidence. [Father's] counsel[ is] correct that [Exhibit] DHS 7 [is comprised of] still photo[graphs] of video. Regardless of the dates of the video [and the still photographs marked as Exhibit] DHS 7, there is no contradiction that [Mother] is depicted in the photo[graphs,] which are taken this year, after May [] 2022, and throughout the summer, showing [Mother] in the vicinity of [Father's] home.

Furthermore, there was clear and convincing testimony by witnesses that, during two pop-up visits at [Father's] home, [Mother's] coat and hat, which she has been [observed] wearing in court – and it was a distinctive [style] of hat that she has [worn] – were present in [Father's] home.

On another occasion, it was believed that [Mother] may have been in the bathroom of [Father's] home [during a pop-up visit]. The [trial] court did not find [Father's] testimony credible as to the explanation of the person [in the bathroom of his home] or the objects [observed] in his home.

In addition, there was testimony that witnesses saw [Mother] waiting outside the courthouse on dates of different hearings. Father's counsel questioned why on earth would he do this because he has a daughter. It would not be shocking to the [trial] court [if Father] still [harbored] feelings for [Mother.]

So, despite the creative arguments made by [Father's] counsel, the [trial] court finds that [Father] has not demonstrated an ability to care for [the] child. Father has not progressed beyond Family School.

In the document introduced by [Father's] counsel as Father's Exhibit 8, it is indicated that [Father] has made some progress[. Nevertheless,] it was reported by [Father's Family School] teacher

- 11 -

that [Father requires] prompting when it comes to managing undesirable behaviors [of the child], using positive strategies toward discipline, during the sessions.

Father has not completed Family School successfully, and has not demonstrated an ability to extend beyond the supervised Family School setting. That does not mean that [the trial] court thinks [Father] poses a specific safety threat to [the child].

But [Father] has not [demonstrated], through his counsel or by any evidence, that he has the ability to care for [the child] and to keep [the child] safe.

With regard to [Section] 2511(a)(5), [i]t has been 40 months. Virtually the entire life of [the child], she has been in care. [Mother and Father] have been afforded more than a reasonable amount of time to demonstrate their ability to care for the child. Again, this does not mean that [Father] does not love his child, but this child has been in care for well more than six months. It has been 40 months.

And despite the arguments by [Father's] counsel, it is [the trial] court's job to do, at all times, what is in the best interest of the child, and [the trial court hopes] that [Father] can realize that. We need to prioritize what is best for [the child] – what would be best for her to have permanency, and not to languish in the court system, in a dependency proceeding.

40 months. [T]hat is more than three years. This is one of the longest cases that [has remained] open with a child. [Mother and Father] have been afforded every opportunity. [The trial court does] not fault [Father] for [Mother's] addictions, but [Father] has not demonstrated an ability to care for [the child] independently.

If [Father] had availed himself sooner to take additional steps, we might not be here, but for whatever reasons, that has not happened and there were safety threats.

**With regard to [Section] 2511(a)(8), [a]gain, it has been 40 months. [DHS] met its burden by clear and convincing evidence as to this element as well, that more than 12 months [] elapsed since the removal of the child.**

**The conditions which led to the removal, which related to [Mother's] drug and alcohol usage, have not been alleviated, and [Father] has not independently**

- 12 -

**demonstrated an ability to care for this child, and has not progressed beyond [] supervised Family School visits with the child.**

**And termination would allow this child to be freed for adoption and to have permanency in her life, which is in the child's best interest. Father's counsel is correct that [DHS] met its burden under [Section] 2511(a), as well as [Section] 2511(b), and [DHS] has done so by clear and convincing evidence.**

**[Section] 2511(b) relates to the parent-child bond. . . . Father has a relationship with the child. The child knows who her father is, but does not look to [this bond as a parent-child] relationship. [The child] does not look to [Father] to meet [] her daily needs or her emotional needs.**

**[The child] does not look to [Father] to [meet her] needs[, as in a typical] parent-child relationship. Simply knowing her father and enjoying time together does not establish the existence of a parent-child bond. For these reasons, [DHS] has met its burden of proof.**

. . .

With regards to [DHS's] request to change the goal, [DHS] met its burden to show that it would be in the child's best interest to change the goal to adoption. This child has been in a loving home since – virtually all of [her] life.

The child[ has] been provided with appropriate interactions in this home, and with the love and care that a child looks to a parent to meet for all of this child's life, and the 40 months that the child has been in care.

N.T., 11/22/22, at 110-117 (emphasis added; extraneous capitalization omitted).

A review of the record demonstrates that the child was placed in the care and custody of DHS upon her discharge from the hospital in July 2019 because the child tested positive for illegal substances at birth due to Mother's illegal drug use during pregnancy. N.T., 8/9/22, at 11. The child was not

placed with Father because he still maintained contact with Mother and there was a concern that Mother was still abusing drugs. *Id.* at 31. The child continued to be in placement when DHS filed a petition for involuntary termination of parental rights on February 12, 2021. Thus, at the time the termination petition was filed, the child had been removed from Father's parental care for more than 12 months. 23 Pa.C.S.A. § 2511(a)(8); *see also C.B.*, 230 A.3d at 348.

In addition to concerns about Mother's continued substance abuse and Father's continued contact with Mother, other factors which necessitated placement included mental health issues, lack of parenting skills, and social isolation and limited social and family support. *See* Exhibit DHS 3 (Initial CUA Single Case Plan, 8/12/19, at 7). With a goal of reunification, Father's single case plan objectives included, *inter alia*, participating in supervised visits, attending and completing Family School, providing proof of housing and employment, and having no contact with Mother. *Id.* at 9; *see also* N.T., 8/9/22, at 29. The trial court ordered DHS *vis-à-vis* its community umbrella agency,[7] to conduct weekly "pop-up" visits of Father's residence to ensure

_____

[7] A "community umbrella agency" ("CUA") is described as:

> community-based agencies that are responsible for the provision of direct case management services to families in their designated region. The CUAs ensure that local solutions and resources are more accessible to children and families. They develop connections to formal and informal neighborhood networks that can strengthen and stabilize families. In addition, they are

that Father is not in contact with Mother. Trial Court Order, 8/21/19; **see also** Trial Court Order, 10/23/19; Trial Court Order, 8/11/19; Trial Court Order, 12/8/21; Trial Court Order, 2/23/22; N.T., 8/9/22, at 31-33.

A CUA case manager testified that Father started Family School on February 16, 2022, but as of the August 9, 2022 termination hearing, has not completed Family School. N.T., 8/9/22, at 42. The case manager further stated that, while Father's home is appropriate for reunification, the child has not been returned to Father because of continuing concerns Father still maintains contact with Mother. *Id.* at 43. The case manager explained that Father has not provided information regarding plans for the child's care while he would be at work, *i.e.* daycare, if reunification occurred, and the case manager believes the child would be left with Mother while Father is at work. *Id.* When asked how the case manager would "rate" Father's compliance with meeting the objectives of his single care plan, the case manager responded, "substantial" but agreed that "the barrier to reunification would be [Father's] ongoing contact with [Mother.]" *Id.* at 44.

The case manager observed that, "[d]uring one pop-up visit [to Father's residence], there was a jacket and hat on [Father's] couch, and someone possibly hiding in a bathroom." *Id.* at 37. During a subsequent visit with

_____

responsible for recruitment and retention of foster and adoptive parents in the neighborhoods where children live.

https://bethanna.org/about/community-umbrella-agency/ (last visited 6/6/23).

Mother, the case manager observed Mother "in the same hat that [the case manager previously] saw on [Father's] couch." *Id.* During another pop-up visit to Father's residence, the case manager observed Mother and Father enter Father's house and when the case manager knocked on the door of Father's house immediately thereafter, no one answered the door. *Id.* The notes contained in DHS's supervisory conference logs,[8] as well as several photographs depicting, *inter alia*, Mother entering Father's residence, confirm that Father continues to maintain contact with Mother. *See* Supervisory Conference Log, 9/25/19 (stating, "[o]n one pop-up visit[, Mother] was at [Father's] home but [Father] was not there"); *see also* Supervisory Conference Log, 11/25/19 (noting that, "[r]eports have been made that [the kinship parent observed Father] dropping [Mother off] to appointments"); Supervisory Conference Log, 4/17/20 (stating, "[kinship parent reported Mother and Father] are living together again along with [Mother's] son, his girlfriend, and their child"); Supervisory Conference Log, 7/16/20 (stating, "[Mother's son] has written a letter and sent pictures requesting that [the child] not be able to return home to her [biological] parents. [Son] believes the [biological] parents are not fit and will not be able to care for [the child] if she were to go back home. Mother is now living with [Father] at his home."); Supervisory Conference Log, 11/20/20 (stating, "[t]here is a

---

[8] The supervisory conference logs were admitted, collectively, as Exhibit DHS 4. N.T., 8/9/22, at 16.

concern that [Mother] is still residing with [Father]"); Supervisory Conference Log, 3/17/21 (stating, "Mother is still staying with [Father] at his home even though both have denied it. Mother was recently seen at [Father's] home and said she recently just stopped by."); Supervisory Conference Log, 8/24/21 (stating, "Mother is still believed to be staying with [Father] even though she is not supposed to. [Father] still claims [Mother] does not live with him and [that she] has no access [to his residence]. Father was told to change his locks if [Mother] has a key."); Exhibit DHS 7; N.T., 8/9/22, at 76-81.

Father testified that Mother's son, the son's girlfriend, and their child lived with Father as recently as 18 months ago, which would be February 2021. N.T., 8/9/22, at 88-89. Father conceded that Mother came to visit the son at Father's residence and would sometimes stay overnight. *Id.* Father stated that Mother's son had a key to the residence but that Father ultimately made the son, his girlfriend, and their child leave the residence. *Id.* at 92-93. Father further conceded that Exhibit DHS 7 is comprised of several photographs showing Mother entering Father's residence, but Father states that he was not home at the time, which suggests that Mother retained independent access to Father's residence. *Id.* at 96. The photographs which comprise Exhibit DHS 7 were captured on July 7, 2022. *See* Exhibit DHS 7.

Upon review, we concur with the trial court, and the record supports, that the conditions which led to the removal and placement of the child continued to exist despite the reasonable good faith efforts by DHS. 23 Pa.C.S.A. § 2511(a)(8); *see also C.B.*, 230 A.3d at 348. Father was required

- 17 -

to attend and complete Family School in order to develop parenting skills. As the trial court noted, as of the November 22, 2022 termination hearing, Father still attended Family School and had not progressed beyond supervised visits with the child. N.T., 11/22/22, at 116. Moreover, as part of Father's reunification objectives, he was ordered to have no further contact with Mother. Despite this requirement, Father permitted Mother's son, and his family, to reside at Father's residence, which, in turn, involved Mother having continued contact with Father. Photographs depict Mother in the vicinity of Father's residence or demonstrate that Mother retained access to Father's residence when Father is at work, even after her son no longer resided at Father's residence and as recently as the summer of 2022. N.T., 11/22/22, at 112. Finally, as the trial court noted, during pop-up visits to Father's residence, Mother's personal items were found in the residence and Mother was observed entering the residence. ***Id.***

We also concur with the trial court, and the record supports, that termination of Father's parental rights would best serve the needs and welfare of the child, as analyzed under Section 2511(a)(8). The child, as noted by the trial court, is in need of parental care and a safe environment in which to grow. Father has not completed Family School and has not independently demonstrated the ability to provide parental care to the child. Moreover, Father's continuing contact with Mother demonstrates Father's inability to provide a safe environment for the child. A child's life, and the need for love, comfort, security, and stability, should not be held in abeyance while a parent

summons the abilities and desire to overcome the obstacles which prevent reunification. *See I.J.*, 972 A.2d at 9.

In examining the effects termination of Father's parental rights would have on the child, as well as the best interest of the child pursuant to Section 2511(b), the trial court considered the safety needs of the child, including a drug-free home, as well as the child's needs for permanency and parental care, including love, security, discipline, and comfort. N.T., 11/22/22, at 110-117. Furthermore, the trial court considered the bond between Father and the child, noting that the child knew Father and enjoyed spending time with him, but the child did not look upon Father as a parent in a parent-child relationship and did not look to Father to meet her daily or emotional needs. *Id.* at 116-117. Upon review, we concur with the trial court, and the record supports, that termination of Father's parental rights is in the best interest of the child pursuant to Section 2511(b). The CUA case manager testified that, in her opinion, a parent-child relationship did not exist between the child and Father. N.T., 8/9/22, at 45. The child, the case manager stated, did not look to Father to fulfill her daily needs, and the case manager did not believe Father would be able to provide for the child's medical needs, including her asthmatic condition, due to his work schedule and lack of plans for daycare. *Id.* at 45, 48. The case manager also explained that the child did not ask to see Father, and Father did not financially support the child or send her cards, letters, or gifts. *Id.* at 45. A teacher at the Family School stated that a relationship existed between the child and Father in that the child recognizes Father as

someone she knows and is familiar with, but that relationship did not equate to a parent-child relationship, which the teacher described as one in which the child is comfortable with the person and feels nurtured by the person.[9] N.T., 11/22/22, at 57-58. The teacher agreed that it would take several months for a parent-child relationship to develop between Father and the child. *Id.* at 56-57. When asked if the child would suffer if Father's parental rights were terminated, the teacher responded that she did not think the child would suffer because the child, at this time, does not understand what Father's relationship is with her and, if that relationship ended, the child would not "feel a void right now." *Id.* at 62-63. The teacher expressed that the kinship parents have a stronger relationship with the child and that, in her opinion, the kinship parents would be able to better redirect the child's behavior and provide better structure for the child. *Id.* at 60.

For these reasons, we concur with the trial court, and the record supports, that DHS has proven by clear and convincing evidence that grounds for termination of Father's parental rights exist under Section 2511(a)(8) and (b). Consequently, we discern no error of law or abuse of discretion in the decree terminating Father's parental rights to the child.

---

[9] The teacher testified that, in her opinion, Father appears "very nurturing with [the child]" and that he is "trying to develop a relationship with [the child.]" N.T., 11/22/22, at 56. A "best interests of the child" analysis under Section 2511(b), however, focuses on the needs and welfare of the child from the child's perspective, and does not take into account the behavior of the parent. *C.B.*, 230 A.3d at 349.

Decree affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 6/15/2023*